Hillsborough-southern judicial district
No. 2003-316

STEPHEN S. OLIVA

v.

VERMONT MUTUAL INSURANCE COMPANY & a.

Argued: January 7, 2004
Opinion Issued: February 17, 2004

*Follender Law Offices, P.L.L.C.*, of Nashua (*Richard C. Follender* on the brief and orally), for the plaintiff.

*Wiggin & Nourie, P.A.*, of Manchester (*Gary M. Burt* and *Ralph Suozzo* on the brief, and *Mr. Burt* orally), for defendant Vermont Mutual Insurance Company.

DUGGAN, J. In this declaratory judgment action, defendant Vermont Mutual Insurance Company (Vermont Mutual) appeals an order of the Superior Court (*Galway,* J.) finding insurance coverage under a homeowner's policy because Jeremy Raskiewicz was "in the care of" its insured, defendant Mavrone Alt, at the time the plaintiff, Stephen S. Oliva, was injured while working with Raskiewicz. We reverse.

The trial court found the following facts. In June 2000, Raskiewicz began staying at Alt's home in Hollis. He remained there until sometime in the fall of 2000. Raskiewicz was twenty years old at the time. He was not related to Alt, but was a friend of her daughter, Cherry. Several other young adults also stayed at Alt's home during this time period.

Alt and Raskiewicz did not have a formal discussion regarding this living arrangement. Nonetheless, Raskiewicz identified Alt's address as his own on his non-driver identification card and received his mail at Alt's home. Raskiewicz did not work, pay rent or contribute to Alt's household expenses. He did, however, eat at Alt's home on a daily basis and was free to use the household amenities without restriction. Alt either cooked meals for everyone in the house, or Raskiewicz and the others ate the leftovers and groceries she supplied. Alt occasionally gave Raskiewicz "pocket change" and money for cigarettes.

Raskiewicz had his own room in Alt's home. The room did not have a door, but was separated from the rest of the home by a curtain that hung in the doorway. Because there was no bed in the room, Raskiewicz slept on a mattress on the floor. He kept his clothing in a bag, but used Alt's washing machine to do his laundry.

Alt did not supervise Raskiewicz or the other young adults who were staying at her home. She did, however, develop a few rules that she expected Raskiewicz and the others to follow. Alt asked that someone be home to meet her six-year-old son when he got off the school bus. She required Raskiewicz and the others to be in the house and quiet by a certain time each night; otherwise, Alt locked the doors and they were responsible for finding a place to spend the night. If Alt went away for the weekend, she asked Raskiewicz and the others to vacate the premises for fear that they would have a party in her absence. In addition, Raskiewicz and the others were responsible for doing the dishes and completing various household chores.

Cherry's boyfriend, Christopher Meeks, was also staying at Alt's home that summer. Alt asked Meeks to perform some needed renovations on her home. Alt paid Meeks, but Meeks was responsible for paying anyone he hired to assist him. Alt suggested that Meeks ask Raskiewicz to help with the renovations.

Oliva was a friend of Cherry's who visited Alt's home frequently. On September 5, 2000, Oliva was assisting Meeks and Raskiewicz with the renovations when he severely injured his hand while cutting a piece of wood with a power saw.

Oliva brought suit against Alt and Raskiewicz, alleging that his injury resulted from Raskiewicz's failure to secure the wood Oliva was cutting with the power saw. At the time of Oliva's injury, Alt had a homeowner's insurance policy issued by Vermont Mutual. Oliva filed a petition for declaratory judgment, alleging that Raskiewicz was an "insured" under Alt's homeowner's policy. After a trial on the merits, the court ruled that Raskiewicz was an "insured" under the Vermont Mutual policy because he

was "in the care of" Alt at the time of Oliva's injury. The correctness of this ruling is the sole issue raised on appeal.

"The interpretation of insurance policy language is a question of law for this court to decide." *Godbout v. Lloyd's Ins. Syndicates Messrs.*, 150 N.H. 103, 105 (2003) (quotation omitted). "We construe the language of an insurance policy as would a reasonable person in the position of the insured based on a more than casual reading of the policy as a whole." *Id.* (quotation omitted). "Policy terms are construed objectively, and where the terms of a policy are clear and unambiguous, we accord the language its natural and ordinary meaning." *Id.* (quotation and brackets omitted). "We need not examine the parties' reasonable expectations of coverage when a policy is clear and unambiguous; absent ambiguity, our search for the parties' intent is limited to the words of the policy." *Id.* (quotation and brackets omitted).

The policy defines an "insured" as:

> [Y]ou and residents of your household who are:
> a. Your relatives; or
> b. Other persons under the age of 21 and in the care of any person named above.

The parties do not dispute that Raskiewicz was twenty years old at the time of Oliva's injury. The only dispute is whether Raskiewicz was "in the care of" Alt.

■■ As a threshold matter, we must determine whether the phrase "in the care of" is ambiguous. The "fact that the parties may disagree on the interpretation of a term or clause in an insurance policy does not create an ambiguity." *St. Paul Fire & Marine Ins. Co. v. Warren*, 87 F. Supp. 2d 904, 909 (E.D. Mo. 1999). In addition, "[p]olicy provisions are not ambiguous merely because it is difficult to apply the factual situation to the specific policy language." 2 L. RUSS & T. SEGALLA, COUCH ON INSURANCE 3D § 21.14, at 21-26 (1997). "On the other hand, where a provision is subject to more than one interpretation, illogically located and labeled within the policy, and inconsistent with other provisions, it will be found to be ambiguous." *Id.*

■ We are unconvinced that the phrase "in the care of" is ambiguous simply because the parties disagree about whether Raskiewicz was "in the care of" Alt. *See Warren*, 87 F. Supp. 2d at 909. Moreover, "in the care of" is not illogically located or labeled in the Vermont Mutual policy, nor is it inconsistent with other provisions. *See* RUSS & SEGALLA, *supra* § 21.14, at 21-26. Rather, "in the care of" is "a colloquial or idiomatic phrase that is

peculiar to itself and readily understood as a phrase by speakers and readers of our language." *Henderson v. State Farm Fire and Cas. Co.*, 596 N.W.2d 190, 194 (Mich. 1999). Consistent with other jurisdictions, we conclude that the phrase "in the care of" is commonly used, readily understood and, therefore, unambiguous. *See, e.g., State Farm Fire and Cas. Co. v. Breazell*, 478 S.E.2d 831, 833 (S.C. 1996); *Cierzan ex rel. Weis v. Kriegel*, 655 N.W.2d 217, 221 (Wis. Ct. App. 2002), *review denied*, 661 N.W.2d 102 (Wis. 2003). Thus, "our search for the parties' intent is limited to the words of the policy." *Godbout*, 150 N.H. at 105 (quotation omitted).

■ Because the interpretation of insurance policy language is a question of law for this court to decide, we now define "in the care of." *Id.* We adopt the list of eight non-exclusive common sense factors set forth by the Michigan Supreme Court in *Henderson. See Henderson* 596 N.W.2d at 195-96. Accordingly, in determining whether an individual is "in the care of" another, the fact finder should consider, without limitation, the following:

> (1) is there a legal responsibility to care for the person;
> (2) is there some form of dependency;
> (3) is there a supervisory or disciplinary responsibility;
> (4) is the person providing the care providing substantial essential financial support;
> (5) is the living arrangement temporary or permanent, including how long it has been in existence and is expected to continue;
> (6) what is the age of the person alleged to be "in the care of" another (generally, the younger a person the more likely they are to be "in the care of" another);
> (7) what is the physical or mental health status of the person alleged to be "in the care of" another (a person with health problems is more likely to be "in the care of" another); and
> (8) is the person allegedly "in the care of" another gainfully employed (a person so employed is less likely to be truly dependent on another)?

*Id.*

■ Other courts that have been asked to determine whether an individual is "in the care of" another have required a significant degree of supervisory and custodial control. *Compare Warren*, 87 F. Supp. 2d at 910-11 (concluding that children of the insured's girlfriend were "in the care of" the insured because the insured looked after the children and provided them with permanent housing and health insurance), *and Breazell*, 478

S.E.2d at 832 (holding that two-year-old foster child was in the "exclusive care" of the insureds), *with Horace Mann Ins. v. Stark*, 987 F. Supp. 562 (W.D. Mich. 1997) (finding that child living with her mother at child's grandparents' house was not "in the care of" grandparents because child's mother retained supervisory and custodial control of child), *and Cierzan*, 655 N.W.2d at 222-23 (holding that sixteen-year-old grandchild was not "in the care of" her blind grandmother when she visited her grandmother's home to assist with various household tasks). In accord with these holdings, we conclude that the phrase "in the care of" connotes a level of support, guidance and responsibility that is most often present in situations where an insured cares for a minor child, an elderly person or an incapacitated individual.

Finally, we turn to the trial court's application of the law to the facts of this case. We will disturb the trial court's factual findings only if they are contrary to the weight of the evidence or erroneous as a matter of law. *Trombley v. Liberty Mut. Ins. Co.*, 148 N.H. 748, 751 (2002). On the other hand, we review the trial court's application of the law to the facts *de novo*. *Coyle v. Battles*, 147 N.H. 98, 100 (2001). Although we agree with the trial court's adoption of the *Henderson* factors and its factual findings, we disagree with the trial court's application of the law to the facts.

We recognize that the trial court found that Raskiewicz was dependent on Alt for food and shelter, and that she had rules that Raskiewicz was expected to follow. We further recognize that the trial court determined that Alt provided "substantial essential financial support" to Raskiewicz by paying the household bills and providing him with "pocket change." Nonetheless, we conclude that Alt's assistance, although generous, did not rise to the level of support, guidance and responsibility that is necessary to conclude that Raskiewicz was in her care.

■ Rather, we hold that Alt's minimal supervision and support of Raskiewicz were outweighed by the other *Henderson* factors. Notably, Alt had no legal responsibility to care for Raskiewicz. Moreover, the living arrangement was temporary. Raskiewicz began staying at Alt's home in June 2000 and moved out in the fall of 2000. In addition, Raskiewicz was twenty years old, a legal adult, in the summer of 2000. He had no physical or mental health impairments that would require additional care or preclude him from functioning independently. Finally, if Raskiewicz was not in Alt's home at the designated time each night, he was responsible for finding a place to spend the night.

Thus, after careful consideration of the *Henderson* factors, we conclude that Raskiewicz was not "in the care of" Alt at the time Oliva was injured.

*Reversed.*

BRODERICK, C.J., and NADEAU and DALIANIS, JJ., concurred.